1  SALLY M. HANDMAKER (SBN 281186)
2      Email: shandmaker@cohenmilstein.com
   COHEN MILSTEIN SELLERS & TOLL, PLLC
3  1100 New York Ave., Suite 500
   Washington, D.C. 20005
4  Telephone: 202-408-4600

5
   MICHAEL D. BRAUN (SBN 167416)
6      Email: mdb@braunlawgroup.com
   BRAUN LAW GROUP, P.C.
7  10680 West Pico Boulevard, Suite 280
   Los Angeles, California 90064
8  Telephone: 310-836-6000

9
   Attorneys for Plaintiffs
10 (Additional Counsel Listed On Following Page)

11

12

13

14                UNITED STATES DISTRICT COURT

15                CENTRAL DISTRICT OF CALIFORNIA

16 JAMIE BEECHUM, JEANNIE HART         CASE NO: 2:15-cv-8239
   and MONICA HERVEY on behalf of
17 themselves and all others similarly
   situated,
18                                      CLASS ACTION
19              Plaintiffs,
20      v.                              COMPLAINT FOR DAMAGES
                                        AND EQUITABLE AND
21 NAVIENT SOLUTIONS, INC., and         INJUNCTIVE RELIEF
   DOES 1 THROUGH 10,
22              Defendants.             DEMAND FOR JURY TRIAL
23

24

25

26

27

28

Additional Counsel of Record

WILLIAM J. GENEGO (SBN 103224)
  Email: bill@genegolaw.com
LAW OFFICE OF WILLIAM GENEGO
2115 Main Street
Santa Monica, California 90405
Telephone:  310-399-3259


EVAN A. JENNESS (SBN 136822)
    Email: evan@jennesslaw.com
LAW OFFICES OF EVAN A. JENNESS
2115 Main Street
Santa Monica, California 90405
Telephone:  310-399-3259


JANET LINDNER SPIELBERG (SBN 221926)
    Email: jlspielberg@jlslp.com
LAW OFFICES OF JANET LINDNER SPIELBERG
12400 Wilshire Boulevard, # 400
Los Angeles, California 90025
Telephone: 310-392-8801

1    Plaintiffs Jamie Beechum, Jeannie Hart and Monica Hervey bring this action
2  against Defendant Navient Solutions, Inc., on behalf of themselves and all others
3  similarly situated (the "Class," as defined further in ¶ 101), and based on their
4  knowledge, the investigation of counsel and information and belief, allege as
5  follows:

6  **I.    INTRODUCTION**

7    1.    Plaintiffs have been charged interest above 18% per annum on their
8  private credit student loans by Defendant Navient Solutions, Inc. ("NSI") or its
9  predecessors. Each has been charged interest over 13% per annum within the past
10 three years, and two are currently being charged interest above 13% - the lowest rate
11 they have been charged since obtaining their loans over ten years ago.

12   2.    These rates are usurious under the California Constitution and the
13 California Usury Law, which prohibit charging interest at an annual rate exceeding
14 10% per annum for loans used primarily for such things as educational expenses,
15 except when loans are made by a bank.

16   3.    Plaintiffs' loan contracts identified the lender as Stillwater National
17 Bank and Trust Company ("Stillwater"), a national bank located in Stillwater,
18 Oklahoma. Unbeknownst to the Plaintiffs, however, Stillwater was a nominee.
19 Stillwater did not make the loans and was not in fact the actual lender. The loans
20 were made by the Student Loan Marketing Association ("SLMA"), which was the
21 actual lender.

22   4.    The SLMA originated, underwrote and funded the loans under a
23 confidential agreement, the ExportSS® Agreement, between the SLMA and
24 Stillwater. The ExportSS® Agreement further provided that Stillwater was required
25 to sell the loans to the SLMA at cost within 90 days of being funded. This
26 arrangement allowed the SLMA to create the false impression that the loans were
27 made by Stillwater and therefore exempt from the California usury laws. In truth
28

1

and in fact, the SLMA made the loans and was the lender, and used Stillwater as a nominee in order to evade compliance with California state law.

5.      This arrangement enabled the SLMA to make high-interest private loans to students attending for-profit schools without the scrutiny of any regulatory body. The SLMA was not concerned with whether the students would be able to repay the loans because the SLMA charged borrowers a supplemental fee that was used to fund insurance on the loans in favor of the SLMA. As a result, when a borrower defaults, the SLMA is paid in full on the loan, including principal and interest, by the borrower-financed insurance, although repayment in full is still due from the borrower.

6.      The SLMA made thousands of loans to California borrowers using Stillwater as the nominee lender.

7.      The loans were and continue to be serviced by a SLMA subsidiary, or a successor entity, which is now Defendant Navient Solutions, Inc. ("NSI").

8.      NSI and its predecessors collected, and continue to collect, millions of dollars to which they were not, and are not, entitled.

9.      Because the substance of the transaction establishes that the loans were made by the SLMA, and not by a national bank, all interest charged on Plaintiffs' loans at a rate exceeding 10% per annum was and is usurious and unlawful. Plaintiffs, and the Class, are entitled to treble damages for interest paid within one year of bringing suit that was charged at a rate exceeding 10% per annum; the return of all interest previously paid that was charged at a rate exceeding 10% per annum; and injunctive relief prohibiting Defendant NSI from charging interest at a rate exceeding 10% per annum.

II.   PARTIES

10.      Plaintiff Jamie Beechum is a California citizen residing in Los Angeles County, California. Plaintiff Beechum applied for and obtained a private credit

2

student loan in May 2004 while a citizen and resident of the State of California by signing a loan application that identified Stillwater National Bank and Trust Company as the lender. The interest rate on her loan has been above 18% per annum and has never been below 13.125% per annum, which is the current rate. Plaintiff Beechum has paid interest on the loan. The loan remains outstanding.

11.     Plaintiff Jeannie Hart is an Oregon citizen residing in Multnomah County. Plaintiff Hart applied for and obtained a private credit student loan in 2002 while a citizen and resident of the State of California by signing a loan application that identified Stillwater National Bank and Trust Co. as the lender. The interest rate on her loan has been above 18% per annum and has never been below 13.125% per annum, which is the current rate. Plaintiff Hart has paid interest on the loan. The loan remains outstanding.

12.     Plaintiff Monica Hervey is a California citizen residing in Los Angeles County, California. Plaintiff Hervey applied for and obtained private credit student loans in 2003 and 2004 while a citizen and resident of the State of California by signing loan applications that identified Stillwater National Bank and Trust Co. as the lender. The interest rates on her loans have been above 18% per annum and she has been charged interest at a rate exceeding 10% per annum within the last three years. Plaintiff Hervey has paid interest on the loans that was charged at a rate above 10% per annum. The loans remain outstanding.

13.     **Defendant Navient Solutions, Inc.** ("Navient Solutions" or "NSI") is a Delaware Corporation, and is a wholly owned subsidiary of Navient Corporation. NSI is the successor entity to Sallie Mae, Inc. ("SMI"), which serviced Plaintiffs' private credit student loans prior to NSI.  The entity that serviced Plaintiffs' loan prior to SMI, Sallie Mae Servicing, LLP, was a subsidiary of the SLMA, and was merged into Sallie Mae, Inc. Thus, from its inception to the present, NSI or one of

its predecessors has serviced Plaintiffs' private credit student loans for which Stillwater was identified as the original lender.[1]

14.    NSI charged Plaintiffs and Class members interest at a rate exceeding 10% per annum, and obtained payments from Plaintiff and Class members that included interest that was charged at a rate exceeding 10% per annum.

15.    **Doe Defendants 1 through 10** are the trusts or other entities to which Plaintiffs' loans have been assigned, and are the current nominal owners of the loans. Plaintiffs have never been told the name of the trust(s) or other entities that own their loans. Plaintiffs asked Defendant NSI what entity owned their loans and were told it was NSI or that it was "Sallie Mae" or that the representative could not provide that information. As a result, the true identities of the loan owners are unknown to Plaintiffs. Plaintiffs will amend this complaint to add their true names and capacities when they become known.

## III.    JURISDICTION AND VENUE

16.    Jurisdiction of this Court is proper under 28 U.S.C. § 1332 as there is diversity of citizenship between the parties.  Plaintiffs are citizens of California and Oregon. Defendant Navient Solutions, Inc. is incorporated in the State of Delaware and has its primary offices in Newark, Delaware.

17.    Upon information and belief, the amount in controversy exceeds $5,000,000 for Plaintiffs and the Class collectively, exclusive of interest and costs, by virtue of the revenue and profits reaped by Defendants from their transactions with Plaintiffs and the Class as a direct and proximate result of their wrongful conduct, and by virtue of the injunctive and equitable relief sought.

---

[1] All subsequent references in this Complaint to "NSI" include its predecessors in interest, SMI and Sallie Mae Servicing, LLP.

4

18.     The total number of Class members is likely to be in the thousands if not tens of thousands.

19.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).  Defendant NSI transacts business within this district. A substantial portion of the underlying transactions and events complained of occurred in this district, and affected persons reside or resided, in this district.

## IV.     FACTUAL ALLEGATIONS

### A.     The California Constitution and the California Usury Law Prohibit Non-Bank Lenders From Charging Interest At a Rate Exceeding 10% Per Annum

20.     The California Constitution, art. XV, § 1, sets the maximum rate of interest at 10% per annum for loans of money used primarily for personal, family, or household purposes, such as loans used to pay for educational expenses.  Only banks licensed under the laws of the United States of America, California, or another state are exempt from this limitation. See Cal. Const., art. XV, § 1 (providing that loans "made by … any bank created and operating under and pursuant to any laws of [California] or of the United States of America" are not subject to the usury limit); Calif. Fin. Code § 1675 (exempting "[a]ny foreign (other state) state bank" from the interest rate restrictions of Cal. Const., art. XV, § 1.

21.     California's statutory proscription against usury is set forth in what is collectively referred to as the "Usury Law," an un-codified Initiative Measure adopted nearly 100 years ago which is set forth in three sections. See Cal. Civ. Code § 1916-1 through 1916-3. In accordance with the California Constitution, the California Usury Law limits the interest rate on loans of money used primarily for personal, family, or household purposes to 10% per annum for non-exempt lenders.

22.     California law recognizes that the substance of a transaction, not its form, determines whether a loan is subject to California's usury laws.

5

Case 2:15-cv-08239-BRO-MRW Document 1 Filed 10/21/15 Page 8 of 29 Page ID #:8

## B. SLMA Privatization

23. The SLMA was created pursuant to federal statute and chartered by the federal government as a government sponsored enterprise ("GSE"). The SLMA was prohibited by statute from originating loans.

24. In or about 1994, Congress required the SLMA to transition to a wholly private company no later than September 30, 2008.

25. As part of the transition, various segments and subsidiaries of the SLMA were acquired by the SLM Corporation ("SLM Corp."), a parent holding company that continued the SLMA's operations during the transition period and after the SLMA's dissolution.

26. The SLMA, and its parent the SLM Corp., wanted to change its business to include loan origination and lending. Beginning in no later than 2002, the SLM Corp. sought to acquire or establish a bank to enable it to operate as a lender, but it was not permitted to do so by the United States Department of the Treasury until after the SLMA's dissolution.

27. The SLMA and SLM Corp., and its wholly-owned subsidiaries, knew that if they made student loans directly, they could not avail themselves of the exemptions provided to bank lenders, and would be subject to the usury limits imposed by California state law. Rather than comply with California law, the SLMA, and the SLM Corp. and its wholly-owned subsidiaries, circumvented the law by entering into forward purchase agreements with so-called lender partners, to make it appear that the lender was a national bank.

28. The forward purchase agreements included a commitment by the SLMA to purchase a specified dollar volume of loans within a set period of time.

29. One such forward purchase agreement was the ExportSS® Agreement between the SLMA and Stillwater National Bank and Trust Company (the "SLMA-Stillwater Agreement"), located in Stillwater, Oklahoma. See Exhibit (Ex.) A.

6

C.    The Substance of the SLMA-Stillwater Agreement

30.    The SLMA-Stillwater Agreement became effective July 1, 2002. Ex. A at 1.

31.    The terms of the SLMA-Stillwater Agreement and its implementation evince that Stillwater was a mere nominee and that the SLMA made the loans and was the actual lender.

32.    Under the SLMA-Stillwater Agreement, the SLMA would originate, underwrite, market and fund loans for which Stillwater would be identified as the lender, and which the SLMA would then purchase from Stillwater.

33.    The loans encompassed by the SLMA-Stillwater Agreement included certain private credit student loans, referred to as "Eligible Private Loans," as defined in Part II of Attachment H to the Agreement, and subsequent amendments.

34.    The SLMA committed to funding and purchasing at least $120,000,000.00 in Eligible Private Loans during the initial commitment period, July 1, 2002 to June 30, 2005, an amount that was subsequently substantially increased. Ex. A at 36-37.

35.    Under the SLMA-Stillwater Agreement, the SLMA would originate "Private Loans,"[2] as the exclusive agent for Stillwater, and Stillwater agreed not to create or otherwise participate in any program that competed with the SLMA's Signature Education Loan program. Ex. A at 3, 23-24.

36.    Loans were funded from a bank account maintained by the SLMA. Ex. A at 5. Stillwater was required to provide the SLMA with a power of attorney which, among other things, authorized the SLMA to debit a Stillwater account in order to

_____

[2] The terms "Private Loan," or "Private Loans," as used throughout this Complaint, refer to and include loans made under the Agreement between the SLMA (and its successors) and Stillwater that are not federal loans, nor guaranteed or insured by any government entity, and include Signature Loans, CEC Signature Loans (also referred to as CEC Private Loans), and CEC Recourse Loans.

7

1   fund all loan disbursements and other payments. Ex. A at 5, 57. The SLMA

2   disbursed the loan funds and sent a disbursement roster to the schools. Ex. A at 6.

3       37.    Stillwater sold and the SLMA purchased 100% of the Eligible Private

4   Loans within 90 days of disbursement.

5       38.    The SLMA-Stillwater Agreement specified the loans would be sold to

6   the SLMA for principal, plus accrued interest, and less the amount paid or payable

7   to insure the loans. Ex. A at 25.  In other words, the SLMA purchased the loans at

8   cost. Stillwater received no premium from selling or transferring the loans, as would

9   be expected if Stillwater had been the original lender or had actually made the

10  loans.

11      39.    The SLMA paid Stillwater for the use of its charter by permitting

12  Stillwater to receive interest on the funded loans for 90 days.

13      40.    Stillwater did not have any risk of loss with respect to the loans

14  because, *inter alia*, the SLMA provided the funds for the loans and agreed in

15  advance to purchase the loans from Stillwater, and Stillwater was the beneficiary of

16  the insurance on the loans for the period preceding their transfer to the SLMA.  See

17  Ex. A at 19, 36-37, 65.  In fact, the SLMA agreed to and did purchase loans of

18  borrowers who died or became disabled while still nominally owned by Stillwater.

19      41.    The SLMA controlled all aspects of marketing loans to student

20  borrowers, and required Stillwater to "print, package and distribute... Application

21  Materials in forms acceptable to [the SLMA]," based on "a design template for such

22  materials" provided by the SLMA. Stillwater was not allowed to alter the content or

23  description of Application Materials without the SLMA's express written consent.

24  Ex. A at 13. Stillwater's role was to add its "name, state, logo and OE number," to

25  the applications, which made it appear as if Stillwater was the lender.

26      42.    Among other things, the SLMA: set the terms of the Private Loans;

27  controlled the schools at which the loans could be made; determined which students

28  would be approved for loans and for what amounts; and determined the interest

8

1    rate on a borrower's loan based on proprietary credit criteria established by the

2    SLMA. Ex A at 3-4, 64-66, 70-73, 79-82.

3         43.    When the SLMA was dissolved in 2004 and merged into the SLM

4    Corp., the SLMA-Stillwater Agreement was amended, and the SLMA's role was

5    assigned to two wholly-owned subsidiaries of the SLM Corp., the SLM Education

6    Credit and Finance Corporation ("SLM ECFC"), and Sallie Mae, Inc. ("SMI").

7    **D.**    **The SLMA Establishes a Securitization Program to Raise Funds to**

8           **Make Loans**

9         44.    The SLMA, and its parent and successor entity SLM Corp., obtained

10   the funds to make loans through a securitization program, which raised funds by

11   selling interest-bearing notes to investors.

12        45.    At a meeting on July 25, 2002, the SLM Corp.'s Board of Directors

13   authorized the SLM Corp. or its subsidiaries to establish one or more subsidiary

14   corporations or limited liability corporations by which to securitize private loans.

15        46.    Thereafter, the SLM Corp. and its subsidiaries established one or more

16   "SLM Private Credit Student Loan Trust" each year ("SLM Private Credit Trust"

17   or "SLM Private Credit Trusts"). The SLM Private Credit Trusts issued and sold

18   notes to investors, with each Trust raising more than $1 billion. The funds were

19   used to make private loans through the SLMA's forward purchase commitments.

20        47.    The SLM Private Credit Trusts do not take physical possession of the

21   promissory notes. The promissory notes remain in the possession and custody of

22   NSI.

23        48.    Plaintiffs' Private Loans were transferred from the SLMA (and after it

24   was dissolved, from SLM ECFC) to various SLM Private Credit Trusts.

25

26

27

28

1

2

### E. Private Loans Made Under the SLMA-Stillwater Agreement Are Subject to and Not Exempt From California's Usury Law

3

4

5

49.     The contracts used to make Private Loans under the SLMA-Stillwater Agreement consisted of a one page application, and a corresponding promissory note.[3]

6

7

8

50.     All of the applications identified Stillwater National Bank, Stillwater, Oklahoma as the "Lender," and all the promissory notes stated that the loan was subject to the laws of the state where the lender was located.

9

10

51.     Plaintiffs were provided disclosure notices that identified Stillwater as the lender.

11

12

13

14

15

52.     Notwithstanding the form of the transaction, the substance of the transaction was that the SLMA was the actual lender that made Plaintiffs' loans, not Stillwater. Plaintiffs' loans are thus subject to the California usury limit of 10% per annum because under California law the substance, not the form of a transaction determines whether it is subject to the Usury Law.

16

### F. The Loans Are Not Subject to National Bank Act Preemption

17

18

19

20

53.     The National Bank Act ("NBA"), 12 U.S.C. § 85 provides that loans made by a national bank are subject to the interest rates of the home state of the national bank, regardless of where the loans were made, and preempts other states' usury laws.

21

22

23

24

25

54.     The Private Loans of Plaintiffs and the Class are not subject to the preemption provision of the NBA because the loans were not made by Stillwater, or any other national bank. Instead, under the terms of the SLMA-Stillwater Agreement, and as implemented, the loans were made by the SLMA, and later by SLM ECFC and other SLM Corp. subsidiaries.

26

_____

27

28

[3]  An exemplary application page and corresponding promissory note are attached as Ex. B.

**G.** **The Department of the Treasury's Draft Report Determined the SLMA Originated Student Loans**

55.     In 2011, the Office of Sallie Mae Oversight ("OSMO") of the U.S. Department of the Treasury first published on its website a draft report dated March 2006 and entitled, "Lessons Learned from the Privatization of Sallie Mae" ("OSMO Draft Report"). The OSMO Draft Report examined in detail the true role of the SLMA in making loans.

56.     The Draft Report explained that the SLMA had viewed its "wind down as an opportunity to reinvent its business ... to a vertically integrated company that originated loans for itself (and thereby controlled its acquisition costs)..." Ex. C at p. 5 (footnote omitted). However, because the SLMA was not a bank, it used so-called lender partner banks, such as Stillwater, to make it appear as if the loans were made by a national bank. Notwithstanding the form of these transactions, the Draft Report stated:

> Based on its examination of SLMA's relationship with its funding
> bank partners, OSMO concluded that SLMA, in substance, was
> originating certain private loans. The funding banks did not take
> long-term possession of the notes signed by the student borrowers,
> nor did they assume the credit risk associated with the notes. The
> GSE [SLMA] unconditionally purchased the notes, generally within
> a month, even in case of the borrower's death. Further, the
> economic substance of the payments by SLMA to the funding banks
> reflected loan origination via a "storefront" rather than second
> market activity.

Ex. C at 15 (footnote omitted).

57.     The OSMO Draft Report further explained, "[i]n a true secondary market, a bank would sell its asset into the secondary market (i.e., to Sallie Mae) at its fair value. However, in practice that was not how these loans 'sold' to Sallie Mae

1    were priced." Ex. C at 15, n. 199. Instead, "[t]he loans were sold to Sallie Mae by its

2    'storefront banks' at cost plus interest during the holding period rather than at fair

3    value.  This was, in effect, origination by SLMA." *Id.*

4         58.    As part of its new origination business, the SLMA and its affiliated

5    entities expanded into so-called "trade school loans" and other private loans, raising

6    billions of dollars through securitization to make loans available to students

7    attending for-profit schools. By 2004, when the SLMA was dissolved and merged

8    into the SLM Corp., the SLM Corp. was managing $12 billion in private loans. Ex.

9    C at 10-11.

10        **H.   NSI Charges and Receives Usurious Interest**

11         59.    The Private Loans of Plaintiffs and the Class accrue interest from the

12    date funds are disbursed until the loans are re-paid in full. Interest is charged at a

13    "Variable Rate," which is determined by adding a fixed percentage set at the time

14    the funds are disbursed (the "Margin"), to the prime rate.

15         60.    The Variable Rate is defined as:

16        the annual rate equal to the sum of the highest Prime Rate published in The

17        Wall Street Journal Credit Markets' section, "Money Rates" table on the

18        fifteenth day of the last month of the quarter prior to [the] loan's

19        disbursement or Change Date (the "Current Index") plus or minus the

20        percentage as identified on my Disclosure Statement, which is hereby

21        incorporated into this Note, per annum (the "Margin") and rounded to the

22        nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate

23        for each quarter beginning January 1st will be determined by the applicable

24        Prime Rate published on the preceding December 15th.)  The Margin is

25        based on my school, credit history and co-borrower-s credit history.  Once

26        set, the Margin does not change.  The actual interest rate during the quarter

27        in which my loan is disbursed will be on my Disclosure Statement.

28    Ex. B at 2, Sec. C.2.

61.     Thus, in any given quarter, NSI charges interest on the Private Loans of Plaintiffs and the Class at a rate equal to the (variable) Prime Rate *plus* the (fixed) Margin.

62.     Borrowers were not told the Margin (or the resulting interest rate) when they applied for a loan, or even when they were notified their application had been approved. Borrowers were first told the interest rate they were being charged when they were notified the loan funds had been or were being disbursed.

63.     Since Plaintiffs obtained their loans, the Prime Rate has ranged between 3.25% and 8.25%. See historical data for the Prime Rate, available at http://www.federalreserve.gov/releases/h15/data.htm.  The Prime Rate published in the Wall Street Journal also ranged between 3.25% and 8.25% during the Class Period.

64.     The fixed Margin for Plaintiffs' loans is 9.85%.

65.     NSI charged interest exceeding 10% per annum on Plaintiffs' loans. In fact, the interest on their loans has been as high as 18.125% per annum, and the interest on the loans of Beechum and Hart has never been below 13.125% per annum.

66.     NSI has charged, or charges, interest at a rate exceeding 10% per annum to numerous student borrowers who have Private Loans.

67.     NSI received millions of dollars of interest on Private Loans of the Class that was charged at a rate exceeding 10% per annum.

### I.     NSI Benefits From the Usurious Interest

68.     NSI has an agreement with each of the SLM Private Credit Trusts to service the Trusts' loans. NSI pays itself a monthly fee for servicing the loans based on the outstanding principal balance of the loans held by the trust. The monthly fee is 1/12 (not to exceed 0.007%) of the sum of the outstanding principal of the loans held by each trust.

69.     NSI benefits from the usurious interest charged and paid by Plaintiffs and members of the Class because higher interest results in the outstanding principal being reduced more slowly. As a consequence, the higher the rate of interest, the more NSI is paid in fees.

**J.      NSI Exercises Control Over and Has a Beneficial Interest in the Plaintiffs' and Class Members' Private Loans**

70.     NSI also acts as administrator of the SLM Private Credit Trusts.

71.     NSI is authorized under certain circumstances to transfer loans out of the SLM Private Credit Trusts and substitute other loans in their place.

72.     NSI is able to and does exercise control over the rate of interest. For example, NSI offers a temporary rate reduction program to certain borrowers reducing the interest rate for a limited period of time.

73.     NSI, or a related entity, is also the beneficiary of the insurance on Plaintiffs' and Class members' Private Loans, not the SLM Private Credit Trusts.

**V.     REPRESENTATIVE PLAINTIFFS AND THE CLASS**

**A.     Plaintiffs' Loans**

74.      **Plaintiff Jamie Beechum** applied for and obtained a Private Loan in 2004 to pay for the cost of her education at Brooks Institute of Photography.

75.     The interest rate is 9.85% *plus* the prime rate, and thus currently is 13.125%.

76.     Plaintiff Beechum's loan was assigned to the SLMA or SLM ECFC shortly after disbursement. Thereafter, the SLMA or SLM ECFC either directly or through intermediaries transferred the loan to a SLM Private Credit Student Loan Trust.

77.     NSI has serviced Plaintiff Beechum's Private Loan since its inception.

78.     **Plaintiff Jeannie Hart** applied for and obtained a Private Loan in 2002 to pay for the cost of her education at Brooks College.

79.     The interest rate is 9.85% *plus* the prime rate, and thus currently is 13.125%.

80.     Plaintiff Hart's loan was assigned to the SLMA shortly after disbursement. Thereafter, the SLMA either directly or through intermediaries transferred the loan to a SLM Private Credit Student Loan Trust.

81.     NSI has serviced Plaintiff Hart's Private Loan since its inception.

82.     **Plaintiff Monica Hervey** applied for and obtained Private Loans in 2003 and in 2004 to pay for the cost of her education at Brooks Institute of Photography.

83.     Plaintiff Hervey's outstanding loans are currently part of NSI's temporary rate reduction program. Her enrollment in the program expires in October 2016, at which time the interest rate will again be above 10% - unless the rate reduction program continues and NSI accepts her into the program for another year.

84.     Plaintiff Hervey's loans were assigned to the SLMA or SLM ECFC shortly after disbursement. Thereafter, the SLMA or SLM ECFC either directly or through intermediaries transferred the loans to one or more SLM Private Credit Student Loan Trusts.

85.     NSI has serviced Plaintiff Hervey's Private Loans since their inception.

**B.     The Private Loans Are the Same in All Material Respects.**

86.     Like all other borrowers who were provided Private Loans as to which Stillwater was identified as the lender, Plaintiffs received a standard form application page and promissory note.  Ex. B.  This promissory note could not be modified or otherwise negotiated by Plaintiffs or other borrowers since it was offered solely on a "take it or leave it" basis, and included statements such as "THIS IS A NON-NEGOTIABLE CONSUMER NOTE." See e.g. Ex. B at 4.

87.     Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, included an assignment clause providing, "If this Note is assigned,

the Assignee will become the owner of this Note and will have all your rights to enforce this Note against me [the borrower]" and "I may not assign this Note or any of its benefits or obligations.  You may assign this Note at any time."  See Ex. B at 3, Sec. L, 10.

88.     Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, included a promise to pay providing that "I will make consecutive monthly payments during the Repayment Period in the amounts and on or before the payment due dates shown on my statements until I have paid all of the principal and interest and any other charges I may owe on this Note." See Ex. B at 2, Sec. D, 3.

89.     Plaintiffs' promissory notes, like all other promissory notes for Private Loans, provided that the interest would be determined at a variable rate. Ex. B at 2, Sec. C, 2.

90.     Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, provided that the interest rate would be determined on a quarterly basis. Ex. B at 2, Sec. C, 2.

91.     Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, provided that accrued interest that was not paid would be capitalized, *i.e.*, added to the loan principal, and interest would then be charged on the increased principal. Ex. B at 2.

92.     As with other borrowers who were provided Private Loans, Plaintiffs received standard disclosure forms advising them of their margins and the supplemental fee.

93.     Plaintiffs paid interest that had been charged at a rate of more than 10% per annum on multiple occasions.

94.     On at least one occasion each of the Plaintiffs did not pay accrued interest that had been charged at a rate exceeding 10% per annum, and such interest

1   was capitalized (*i.e.*, added to the outstanding principal of the loan). Thereafter, NSI

2   charged Plaintiffs interest on the interest that had been capitalized.

3        95.   Plaintiffs, like all Class members who were provided Private Loans, did

4   not know, or have reason to know, that the loans were subject to California law.

5        96.   Neither the SLMA, NSI, nor Stillwater disclosed to Plaintiffs, the Class,

6   or the public, the facts evincing that the substance of the transactions was that the

7   Private Loans had been made by the SLMA and its successors, and not Stillwater.

8   These facts included that the SLMA dictated the terms of the loans; that the SLMA,

9   not Stillwater, funded and disbursed the loans; that Stillwater and the SLMA had

10  agreed in advance that Stillwater would sell loans to the SLMA at cost within 90

11  days of disbursement; and, that Stillwater bore no risk of loss on the loans.

12       97.   The SLMA and NSI fraudulently concealed from Plaintiffs and the

13  Class the facts giving rise to their claims by affirmatively misrepresenting on their

14  loan applications and other documents that the lender who made their loans was

15  Stillwater, and thereby intentionally prevented Plaintiffs and members of the Class

16  from filing suit.

17       98.   The promissory notes and related documents provided Plaintiffs and

18  the Class were replete with disclosures and other provisions represented as being

19  required by law. Accordingly, Plaintiffs and the Class had no reason to believe that

20  the SLMA or its successors or NSI, would fail to comply with applicable law

21  regarding the interest rate, and reasonably trusted and relied on NSI to charge

22  interest in accordance with the law.

23       99.   Plaintiffs and Class members did not consent to pay usurious interest,

24  nor could they have consented to do so, because when they made payments they

25  were unaware they were being charged interest at a usurious rate.

26  **VI.   CLASS ACTION ALLEGATIONS**

27       100.   This action asserts claims pursuant to Federal Rules of Civil Procedure

28  23(a), and 23(b).

17

101.   Plaintiffs bring claims on behalf of themselves and a Class defined as:

All persons who obtained a Signature Loan, a CEC Signature Loan, or a CEC Recourse Loan with a loan application that identified Stillwater National Bank as the lender and listed California as the residence of the borrower, and who were charged interest at an annual rate of more than 10% for any quarterly period, and whose loan is outstanding or was paid off within four years of the filing of this action.

102.     The Class is subject to the following exclusions:

a.   Officers, directors, managerial employees of NSI and its parent and the parent's subsidiaries and their immediate families, and any of the judges of the court before which this case is pending and their immediate families;

b.   Officers, directors, managerial employees of Stillwater and its parent and the parent's subsidiaries and their immediate families;

c.   All Signature Loans, CEC Signature Loans and CEC Recourse Loans that were made with a promissory note that includes an arbitration clause or class action waiver.

**A.    The Class**

103.   There are thousands of members in the Class who are geographically dispersed throughout California. Therefore, individual joinder of all members of the Class would be impracticable.

104.   Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members.  For the Class, these common legal or factual questions include, but are not limited to:

a.   Whether under California law, the substance of the transaction was that the actual lender who made the loans under the SLMA-Stillwater Agreement was the SLMA and its successors;

b.   Whether the loans are subject to the California usury limit of 10% per annum;

18

c.   Whether NSI charged interest on Private Loans at rates exceeding 10% per annum;

d.   Whether under the National Bank Act, the actual lender who made the loans under the SLMA-Stillwater Agreement was the SLMA and its successors;

e.   Whether the loans are not subject to the interest preemption provision of the National Bank Act;

f.   Whether NSI's conduct violated California's Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq.*;

g.   Whether NSI is liable for violations of the California Usury Law;

h.   Whether NSI is liable for conversion;

i.   The appropriate measure of damages; and

j.   The appropriate scope of injunctive relief.

105.   Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs were charged and paid interest at a rate exceeding 10% per annum on their Private Loans, and their loans were made in California. Plaintiffs, therefore, are not materially different in relevant respects from other Class members, and the relief sought is common to the Class.

106.   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members, and they have retained competent counsel experienced in conducting complex lending and class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Class.

107.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class member likely will be small by comparison to the burden and expense of the complex litigation necessitated by Defendants' wrongful conduct.  Thus, it would be virtually impossible for Class members to obtain redress on an individual basis.

1    Additionally, class-wide litigation is preferable because individualized actions could

2    lead to inconsistent or contradictory judgments.

3         108.   A class action also presents far fewer management difficulties, and

4    provides the benefits of single adjudication, including economies of scale, and

5    comprehensive supervision by a single court.  In the alternative, the Class may be

6    certified because Defendants have acted or refused to act on grounds generally

7    applicable to the members of the Class, thereby making appropriate preliminary

8    and final equitable relief with respect to the Class.

9         109.   Upon information and belief, all records concerning each of the Private

10   Loans entered into by members of the Class are in the possession or control of NSI

11   and available through discovery.

12

13   **VII.   CLAIMS FOR RELIEF**

14        **A.    <u>First Claim for Relief</u> — "Unlawful" Business Practices in Violation of**

15             **The Unfair Competition Law, Bus. & Prof. Code §§ 17200, *Et Seq.***

16        110.   Plaintiffs incorporate paragraphs 1-109 as if fully stated here.

17        111.   This claim is brought on behalf of Plaintiffs and the Class.

18        112.   The Unfair Competition Law ("UCL"), California Business and

19   Professions Code §§ 17200, *et seq.*, defines unfair business competition to include

20   any "unlawful, unfair or fraudulent" act or practice.

21        113.   A business act or practice is "unlawful" if it violates any established

22   state or federal law.

23        114.   Article XV of the California Constitution sets a maximum legal rate of

24   10% per annum for interest charged on loans for educational expenses such as the

25   Private Loans. In pertinent part, it states:

26        Section 1.  The rate of interest upon the loan or forbearance of any

27   money, goods, or things in action, or on accounts after demand, shall be 7

28   percent per annum but it shall be competent for the parties to any loan or

forbearance of any money, goods or things in action to contract in writing for a rate of interest:

> (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum....

115.   The Private Loans are loans of money primarily for personal, family, or household purposes subject to Cal. Const., art. XV, § 1(1).

116.   The Private Loans are loans of money expressed "in writing" within the meaning of the Usury Law.  Cal. Civ. Code § 1916-1.

117.   The 10% interest rate limit set forth in Cal. Const., art. XV, § 1(1) and the Usury Law apply to the Private Loans, and such loans are not subject to any of the exemptions from the Usury Law.

118.   The loans were not made by a national bank within the meaning of the National Bank Act, 12 U.S.C. §§ 85 and 86.

119.   NSI has charged interest on the Private Loans at a rate exceeding 10 % per annum and thus exceeding the legal limit.

120.   The interest charged at a usurious rate that was not paid was capitalized (*i.e.*, added to the outstanding principal).

121.   Defendant NSI has violated and continues to violate, the "unlawful" prong of the UCL by charging borrowers interest in violation of California's Constitution, art. XV, § 1(1), and the Usury Law. By committing the acts and practices alleged above, Defendant has engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq*.

122.   Through its unlawful acts and practices Defendant NSI has obtained, and continues to unfairly obtain, money from Plaintiffs and the Class. As such, Plaintiffs requests on behalf of themselves and the Class the relief set forth in the

1    Prayer, including that this Court enjoin Defendant from continuing to violate the

2    Unfair Competition Law as discussed herein. Otherwise, the Class may be

3    irreparably harmed and/or denied an effective and complete remedy.

4        **B.**    <u>**Second Claim for Relief — "Unfair" Business Practice in Violation of**</u>

5                **<u>the Unfair Competition Law, Bus. & Prof. Code §§ 17200,</u> _Et Seq._**

6        123.   Plaintiffs incorporate paragraphs 1-109 as if fully stated here.

7        124.   This claim is brought on behalf of Plaintiffs and the Class.

8        125.   A business act or practice is "unfair" under the UCL if the reasons,

9    justifications and motives of the alleged wrongdoer are outweighed by the gravity of

10   the harm to the alleged victims.

11       126.   Defendant NSI has and continues to violate the "unfair" prong of the

12   UCL through its assessment of interest at a rate exceeding 10% per annum on the

13   Private Loans.

14       127.   Defendant NSI's assessment of interest at rates exceeding 10% per

15   annum violates the "unfair" prong of the UCL because it is not entitled to charge

16   such interest, and such interest is excessive and not justified by any business need,

17   and creates an onerous burden on Plaintiffs and the Class.

18       128.   The gravity of the harm to Plaintiffs and the Class resulting from such

19   unfair acts and practices outweighs any conceivable reasons, justifications and/or

20   motives for Defendant's conduct. By committing the acts and practices described

21   above, Defendant has engaged, and continues to be engaged, in unfair business

22   practices within the meaning of California Business and Professions Code §§ 17200,

23   _et seq._

24       129.   Through unfair acts and practices Defendant NSI has obtained, and

25   continues to obtain, money from Plaintiffs and the Class. As such, Plaintiffs request

26   on behalf of themselves and the Class the relief set forth in the Prayer, including

27   that the Court enjoin Defendant NSI from continuing to violate the UCL.

28

1   Otherwise, the Class may be irreparably harmed and/or denied an effective and

2   complete remedy.

3       C.   **Third Claim for Relief** – Usury in Violation of Article XV, Section 1,

4            of the California Constitution

5       130.   Plaintiffs incorporate paragraphs 1-109 as if fully stated here.

6       131.   This claim is brought on behalf of Plaintiffs and the Class.

7       132.   Under the California Constitution, the maximum rate of interest for

8   any loan, if the money, goods, or things in action are for use primarily for personal,

9   family, or household purposes, is 10 % per annum.  Cal. Const., art. XV, § 1(1).

10      133.   The Private Loans are "loans" for "money" for use "primarily for

11  personal, family, or household purposes," within the meaning of the California

12  Constitution, art. XV, § 1(1).

13      134.   The Private Loans are subject to the California Usury Law and are not

14  excluded or otherwise exempt from the constitutional proscription on usury.

15      135.   Defendant NSI charged Plaintiffs and all members of the Class interest

16  exceeding the lawful statutory maximum rate of 10% per annum.

17      136.   The Private Loans and interest thereon are absolutely repayable.

18      137.   Through usurious charges, Defendant NSI has received, and continues

19  to receive, money from Plaintiffs and the Class in violation of the California

20  Constitution. As such, Plaintiffs request on behalf of themselves and the Class the

21  relief set forth in the Prayer, including that this Court enter an order refunding all

22  interest paid that was charged at a usurious rate, or directing it to be applied to

23  principal, cancelling interest that was charged at a rate exceeding 10% per annum

24  that remains outstanding, or that was capitalized, as well as interest that was

25  charged on the capitalized usurious interest, and limiting any future interest to not

26  more than 10% per annum. Plaintiffs also request that this Court award any other

27  relief that is just and proper.

28

1   **D.   Fourth Claim for Relief — Violation of the Usury Law**

2   138.   Plaintiffs incorporate paragraphs 1-109 as if fully stated here.

3   139.   This claim is brought on behalf of Plaintiffs and the Class.

4   140.   California's statutory proscription against usury is set forth in the

5   Usury Law, an un-codified Initiative Measure adopted nearly 100 years ago. See

6   Cal. Civ. Code § 1916-1 through 1916-3.

7   141.   The Usury Law provides in part:

8   The rate of interest upon the loan or forbearance of any money, goods

9   or things in action or on accounts after demand or judgments rendered in

10   any court of this state, shall be seven dollars upon the one hundred dollars

11   for one year and at that rate for a greater or less sum or for a longer or a

12   shorter time; but it shall be competent for parties to contract for the

13   payment and receipt of a rate of interest not exceeding twelve dollars on the

14   one hundred dollars for one year and not exceeding that rate for a greater or

15   less sum or for a longer or shorter time, in which case such rate exceeding

16   seven dollars on one hundred dollars shall be clearly expressed in writing.

17   Cal. Civ. Code § 1916-1.

18   142.   As recognized in *Penziner v. West American Finance Co.*, 10 Cal. 2d

19   160, 174, 74 P.2d 252 (Cal. 1937), the 12% interest rate established by the Usury Law

20   for contracts in writing was amended to 10% by adoption of the usury provisions of

21   the California Constitution.

22   143.   Private Loans are "loans" for "money" expressed "in writing" within

23   the meaning of the Usury Law.  The loans are not excluded or otherwise exempt

24   from the Usury Law.

25   144.   Defendant NSI charged Plaintiffs and Class members interest

26   exceeding 10% per annum.

27

28

145.   The counterparty to the contract willfully intended to enter these transactions and to charge and receive interest charged at a rate exceeding 10% per annum.

146.   Through usurious charges, Defendant has received, and continues to receive, money from Plaintiffs and the Class in violation of the Usury Law, as amended. As such, Plaintiffs request on behalf of themselves and the Class the relief set forth in the Prayer, including an award of three times the interest paid on the Private Loans as provided by the Usury Law, and an order canceling all future interest on the Private Loans exceeding 10% per annum. Cal. Civ. Code § 1916-3(a).

**E.   Fifth Claim for Relief − Claim For Money Had and Received**

147.   Plaintiffs incorporate paragraphs 1-109 as if fully stated here.

148.   This claim is brought on behalf of Plaintiffs and the Class.

149.   Defendant NSI is indebted to Plaintiffs and the Class members.

150.   Defendant NSI received money belonging to Plaintiffs and the Class that should have been used for their benefit by reducing the outstanding principal on their loans.

151.   The money was not used for the benefit of Plaintiffs or the Class.

152.   The money was instead used by Defendant to pay interest that was charged at a usurious rate.

153.   Defendant has not returned any money to Plaintiffs or the Class, nor has Defendant applied the money to principal for the benefit of the Plaintiffs or the Class.

154.   As a matter of equity and good conscience, the money should be returned to Plaintiffs and the Class or be used for their benefit by applying it to the payment of the principal of their respective loans.

**F.   Sixth Claim For Relief - Conversion**

155.   Plaintiffs incorporates paragraphs 1-109 as if fully stated here.

156.   This claim is brought on behalf of Plaintiffs and the Class.

157.   Defendant NSI wrongfully took, and misappropriated, payments of interest that had been charged at a rate exceeding 10% per annum from Plaintiffs and the Class.

158.   Plaintiffs and Class members were the proper owners of the interest payments wrongfully taken by Defendant at the time of the taking.

159.   Plaintiffs and Class members were damaged as a result of the wrongful taking of the interest charged at a rate exceeding 10% per annum. The specific sums in which Plaintiffs and Class members were damaged are capable of identification using Defendant NSI's records.

## VIII.   PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, request an award and relief as follows:

**A.**   An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives for the Class, and that Plaintiffs' counsel be appointed Class Counsel.

**B.**   Restitution in an amount to be determined.

**C.**   An order refunding all interest paid that was charged at a rate exceeding 10% per annum, or directing that it be applied to principal.

**D.**   An order cancelling all interest that was charged at a rate exceeding 10% per annum that was not paid, including interest that was charged at a rate exceeding 10% per annum that was capitalized, and interest charged on that capitalized interest.

**E.**   An order awarding three times the interest paid by Plaintiffs and Class members within one year of filing suit, and thereafter, which was charged at a usurious rate or, alternatively, three times the amount of interest paid on Private Loans exceeding the 10% per annum legal limit.

**F.**   Damages as permitted under California law.

**G.**     An order enjoining interest being charged at a rate exceeding 10% per annum on Plaintiffs' and Class members' Private Loans.

**H.**     An order awarding Plaintiffs' their costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest.

**I.**     Such other and further relief as may be deemed necessary or appropriate.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

DATED: October 21, 2015                    By: _/s/ William J. Genego_