ANDREW FRIEDMAN, admitted *pro hac vice*
    Email: afriedman@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
    Email: shandmaker@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., Suite 500
Washington, D.C. 20005
Telephone: 202-408-4600

MICHAEL D. BRAUN (SBN 167416)
    Email: mdb@braunlawgroup.com
BRAUN LAW GROUP, P.C.
10680 West Pico Boulevard, Suite 280
Los Angeles, California 90064
Telephone: 310-836-6000

Attorneys for Plaintiffs
(Additional Counsel Listed On Following Page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE BEECHUM and MONICA HERVEY on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br>  v.<br><br>NAVIENT SOLUTIONS, INC., SLM PRIVATE CREDIT STUDENT LOAN TRUST 2005-A, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., VL FUNDING LLC and NAVIENT CREDIT FINANCE CORPORATION,<br>     Defendants. | CASE NO: 2:15-cv-8239-JGB (KKx)<br><br><u>CLASS ACTION</u><br><br>CORRECTED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE AND INJUNCTIVE RELIEF<br><br><u>DEMAND FOR JURY TRIAL</u> |

Additional Counsel of Record

WILLIAM J. GENEGO (SBN 103224)
  Email: bill@genegolaw.com
LAW OFFICE OF WILLIAM GENEGO
2115 Main Street
Santa Monica, California 90405
Telephone:  310-399-3259


EVAN A. JENNESS (SBN 136822)
    Email: evan@jennesslaw.com
LAW OFFICES OF EVAN A. JENNESS
2115 Main Street
Santa Monica, California 90405
Telephone:  310-399-3259


JANET LINDNER SPIELBERG (SBN 221926)
    Email: jlspielberg@jlslp.com
LAW OFFICES OF JANET LINDNER SPIELBERG
12400 Wilshire Boulevard, # 400
Los Angeles, California 90025
Telephone: 310-392-8801

Plaintiff Jamie Beechum brings this action against Defendants Navient Solutions, Inc., SLM Private Credit Student Loan Trust 2005-A and The Bank of New York Mellon Trust Company, N.A. (in its representative capacity), and Plaintiff Monica Hervey brings this action against Defendants Navient Solutions, Inc., VL Funding LLC and Navient Credit Finance Corporation, and both bring suit on behalf of all others similarly situated (the "Class," as defined further in ¶105, and based on their knowledge, the investigation of counsel and information and belief, allege as follows:

## I. INTRODUCTION

1. This case involves a private company using a national bank as a nominee to make loans to students at for-profit schools with interest rates as high as 18.125%, nearly double the rate that non-bank lenders are allowed to charge under the California Constitution and the California Usury Law. Because the law looks to the substance of a transaction, not its form, the loans were and are usurious. Just as a borrower may not use a nominee to obtain a lower interest rate, a lender may not use a nominee to obtain a higher interest rate.

2. Defendant Navient Solutions, Inc. ("NSI") and its predecessors have charged Plaintiffs Beechum and Hervey interest above 18% per annum on their private credit student loans, and has charged them interest over 13% within the past three years. NSI continues to charge Plaintiff Beechum interest above 13%, the lowest rate she has been charged since obtaining her loan over ten years ago.

3. These rates are usurious under the California Constitution and the California Usury Law, which prohibit a non-bank lender from charging interest at an annual rate exceeding 10% for loans used primarily for such things as educational expenses.[1]

---

[1] All rates of interest referenced throughout this First Amended Complaint are per annum.

4.     Plaintiffs' loan contracts identified the lender as Stillwater National Bank and Trust Company ("Stillwater"), a national bank located in Stillwater, Oklahoma. Stillwater, however, was a nominee.

5.     The loans were made by the Student Loan Marketing Association ("SLMA"), or subsidiaries of the SLM Corporation ("SLM Corp'"), which were the actual lenders.

6.     The SLMA and the SLM Corp. subsidiaries originated, underwrote, funded and bore the risk of loss as to the loans under a confidential agreement, the ExportSS® Agreement, between the SLMA and Stillwater. The ExportSS® Agreement provided that Stillwater was required to sell the loans to the SLMA at cost within 90 days of being funded.

7.     This arrangement enabled the SLMA and the SLM Corp. subsidiaries to make high-interest private credit loans to students such as Plaintiffs Beechum and Hervey attending for-profit schools without the scrutiny of any bank regulatory body, and without the market restraints faced by regulated lenders.

8.     The SLMA and SLM Corp. subsidiaries made thousands of loans to California borrowers using Stillwater as the nominee lender.

9.     The loans were and continue to be serviced by an SLMA or an SLM Corp. subsidiary, or a successor entity, which is now Defendant Navient Solutions, Inc. ("NSI").

10.     NSI and its predecessors collected, and continue to collect, millions of dollars to which they were not, and are not, entitled.

11.     Because the substance of the transaction establishes that the loans were made by a non-bank lender, and not by a national bank, all interest charged on Plaintiffs' loans at a rate exceeding 10% was and is usurious and unlawful. Plaintiffs, and the Class, are entitled to treble damages for interest paid within one year of bringing suit that was charged at a rate exceeding 10%; the return of all interest

previously paid that was charged at a rate exceeding 10%; and injunctive relief prohibiting Defendant NSI from charging interest at a rate exceeding 10%.

## II.   PARTIES

12.    Plaintiff Jamie Beechum is a California citizen residing in Los Angeles County, California. Plaintiff Beechum applied for and obtained a private credit student loan in May 2004 while a citizen and resident of the State of California by signing a loan application that identified Stillwater National Bank and Trust Company as the lender. The interest rate on her loan has been as high as 18.125% and has never been below 13.125%. Plaintiff Beechum has paid interest on the loan. The loan remains outstanding.

13.    Plaintiff Monica Hervey is a California citizen residing in Los Angeles County, California. Plaintiff Hervey applied for and obtained private credit student loans in 2003 and 2004 while a citizen and resident of the State of California by signing loan applications that identified Stillwater National Bank and Trust Co. as the lender. The interest rate on her loans have been as high as  18.125%, and she has been charged interest at a rate exceeding 10% within the last three years. Plaintiff Hervey has paid interest on the loans that was charged at a rate above 10%. The loans remain outstanding.

14.    **Defendant Navient Solutions, Inc.** ("Navient Solutions" or "NSI") is a Delaware Corporation, and is a wholly owned subsidiary of Navient Corporation. NSI is the successor entity to Sallie Mae, Inc. ("SMI"), which serviced Plaintiffs' private credit student loans prior to NSI.  The entity that serviced Plaintiffs' loan prior to SMI, Sallie Mae Servicing, LLP, was a subsidiary of the SLMA, and was merged into Sallie Mae, Inc. Thus, from its inception to the present, NSI or one of

3

1  its predecessors has serviced Plaintiffs' private credit student loans for which

2  Stillwater was identified as the  lender.[2]

3      15.    NSI charged Plaintiffs Beechum and Hervey and Class members

4  interest at a rate exceeding 10%, and received and continues to receive interest from

5  Plaintiff Beechum and Class members that was charged at a rate exceeding 10%.

6      16.    **Defendant SLM Private Credit Student Loan Trust 2005-A ("2005-A**

7  **Trust")** is a Delaware statutory trust established for the purpose of financing the

8  purchase of private credit student loans. The 2005-A Trust is the current assigned

9  counterparty to and nominal owner of Plaintiff Beechum's private credit student

10  loan.

11      17.    The 2005-A Trust received and continues to receive interest from NSI

12  that was charged Plaintiff Beechum and Class members at a rate exceeding 10%.

13      18.    **The Bank of New York Mellon Trust Company, N.A.,** operates as a

14  nationally chartered trust company and is the trustee for the 2005-A Trust.

15      19.    As the trustee, and pursuant to a trust agreement, The Bank of New

16  York Mellon Trust Company, N.A. carries out the business of the 2005-A Trust,

17  and it may sue or be sued on behalf of the 2005-A Trust. It is sued here in its

18  representative capacity.

19      20.    **Defendant VL Funding LLC ("VL Funding")** is a limited liability

20  company that operates as a subsidiary of Navient Corporation, established for the

21  purpose of purchasing loans from subsidiaries or affiliates of Navient Corporation

22  and its predecessor SLM Corporation. VL Funding is the current assigned

23  counterparty to and nominal owner of one of Plaintiff Hervey's private credit

24  student loans.

25

26  _____

27      [2] All subsequent references in this First Amended Complaint to "NSI"

28  include its predecessors in interest, SMI and Sallie Mae Servicing, LLP.

21.     VL Funding received and continues to receive interest from NSI that was charged to Plaintiff Hervey and Class members at a rate exceeding 10%.

22.     **Defendant Navient Credit Finance Corporation ("NCFC")** is a Delaware corporation and wholly owned subsidiary of Navient Corporation. NCFC is the successor entity to the SLM Education Credit Finance Corporation, which was a wholly owned subsidiary of the SLM Corp. NCFC is the current assigned counterparty to two of Plaintiff's Hervey's private credit student loans.

23.     NCFC received and continues to receive interest from NSI that was charged Plaintiff Hervey and Class members at a rate exceeding 10%.

## III.   JURISDICTION AND VENUE

24.     Jurisdiction is proper under 28 U.S.C. § 1332 as there is diversity of citizenship between the parties.  Plaintiffs are citizens of California. Defendant Navient Solutions, Inc. is incorporated in the State of Delaware and has its primary offices in Newark, Delaware.

25.     The 2005-A Trust was established in Delaware.

26.     The Bank of New York Mellon Trust Company, N.A., is incorporated in California.

27.     VL Funding is incorporated in Delaware.

28.     Upon information and belief, the amount in controversy exceeds $5,000,000 for Plaintiffs and the Class collectively, exclusive of interest and costs, by virtue of the revenue and profits reaped by Defendants from their transactions with Plaintiffs and the Class as a direct and proximate result of their wrongful conduct, and by virtue of the injunctive and equitable relief sought.

29.     The total number of Class members is likely to be in the thousands.

30.     Venue is proper within this judicial district under 28 U.S.C. § 1391(b) and (c).  Defendant NSI transacts business within this district. A substantial portion

of the underlying transactions and events complained of occurred in this district, and affected persons who reside in this district.

## IV.   FACTUAL ALLEGATIONS

### A.   The California Constitution and the California Usury Law Prohibit Non-Bank Lenders From Charging Interest At a Rate Exceeding 10%

31.   The California Constitution, art. XV, § 1, sets the maximum rate of interest at 10%  for loans made by a non-bank lender of money used primarily for personal, family, or household purposes, such as loans used to pay for educational expenses.  Only banks licensed under the laws of the United States of America, California, or another state are exempt from this limitation. See Cal. Const., art. XV, § 1 (providing that loans "made by ... any bank created and operating under and pursuant to any laws of [California] or of the United States of America" are not subject to the usury limit); Calif. Fin. Code § 1675 (exempting "[a]ny foreign (other state) state bank" from the interest rate restrictions of Cal. Const., art. XV, § 1.

32.   California's statutory proscription against usury is set forth in what is collectively referred to as the "Usury Law," an un-codified Initiative Measure adopted nearly 100 years ago which is set forth in three sections. See Cal. Civ. Code § 1916-1 through 1916-3. In accordance with the California Constitution, the California Usury Law limits the interest rate that non-bank lenders may charge on loans of money used primarily for personal, family, or household purposes to 10%.

### B.   SLMA Privatization

33.   The SLMA was created pursuant to federal statute and chartered by the federal government as a government sponsored enterprise ("GSE"). The SLMA was prohibited by statute from originating loans.

34.   In or about 1994, Congress required the SLMA to transition to a wholly private company no later than September 30, 2008.

35.     As part of the transition, various segments and subsidiaries of the SLMA were acquired by the SLM Corp., a parent holding company that continued the SLMA's operations during the transition period and after the SLMA's dissolution.

36.     The SLMA, and its parent the SLM Corp., wanted to change its business to include loan origination and lending. Beginning no later than 2002, the SLM Corp. sought to acquire or establish a bank to enable it to operate as a lender, but it was not permitted to do so by the United States Department of the Treasury until after the SLMA's dissolution.

37.     The SLMA and SLM Corp., and its wholly-owned subsidiaries, knew that if they made student loans directly, they could not avail themselves of the exemptions provided to bank lenders, and would be subject to the usury limits imposed by California state law. Rather than comply with California law, the SLMA, and the SLM Corp. and its wholly-owned subsidiaries, circumvented the law by entering into forward purchase agreements with so-called lender partners, to make it appear that the lender was a national bank.

38.     One such forward purchase agreement was the ExportSS® Agreement between the SLMA and Stillwater National Bank and Trust Company (the "SLMA-Stillwater Agreement"), located in Stillwater, Oklahoma. See Exhibit (Ex.) A.

C.     **The Substance of the SLMA-Stillwater Agreement**

39.     The SLMA-Stillwater Agreement became effective July 1, 2002. Ex. A at 1.

40.     The terms of the SLMA-Stillwater Agreement and its implementation evince that Stillwater was a mere nominee and that the SLMA made the loans and was the actual lender.

41.     Under the SLMA-Stillwater Agreement, the SLMA would originate, underwrite, market and fund loans for which Stillwater would be identified as the lender, and which the SLMA would then purchase from Stillwater.

7

42.     The SLMA-Stillwater Agreement included a commitment by the SLMA to purchase a specified dollar volume of loans within a set period of time.

43.     The loans encompassed by the SLMA-Stillwater Agreement included certain private credit student loans, referred to as "Eligible Private Loans," as defined in Part II of Attachment H to the Agreement, and subsequent amendments.

44.     The SLMA committed to funding and purchasing at least $120,000,000.00 in Eligible Private Loans during the initial commitment period, July 1, 2002 to June 30, 2005, an amount that was subsequently substantially increased. Ex. A at 36-37.

45.     Under the SLMA-Stillwater Agreement, the SLMA would originate "Private Loans,"[3] as the exclusive agent for Stillwater, and Stillwater agreed not to create or otherwise participate in any program that competed with the SLMA's Signature Education Loan program. Ex. A at 3, 23-24.

46.     The Private Loans were funded from a bank account maintained by the SLMA. Ex. A at 5. Stillwater was required to provide the SLMA with a power of attorney which, among other things, authorized the SLMA to debit a Stillwater account in order to fund all loan disbursements and other payments. Ex. A at 5, 57. The SLMA disbursed the loan funds and sent a disbursement roster to the schools. Ex. A at 6.

47.     Stillwater sold and the SLMA purchased 100% of the Eligible Private Loans within 90 days of disbursement.

48.     The SLMA-Stillwater Agreement specified the loans would be sold to the SLMA for principal, plus accrued interest, and less the amount paid or payable

_____

[3] The terms "Private Loan," or "Private Loans," as used throughout this Complaint, refer to and include loans made under the Agreement between the SLMA (and its successors) and Stillwater that are not federal loans, nor guaranteed or insured by any government entity, and include Signature Loans, CEC Signature Loans (also referred to as CEC Private Loans), and CEC Recourse Loans.

to insure the loans. Ex. A at 25.  In other words, the SLMA purchased the loans at cost. Stillwater received no premium from selling or transferring the loans, as would be expected if Stillwater had been the original lender or had actually made the loans.

49.     In effect, the SLMA paid Stillwater for the use of its charter by permitting Stillwater to receive interest on the funded loans for 90 days.

50.     Stillwater did not have any risk of loss with respect to the loans because, *inter alia*, the SLMA provided the funds for the loans and agreed in advance to purchase the loans from Stillwater.  See Ex. A at 19, 36-37, 65.  In fact, the SLMA agreed to and did purchase loans of borrowers who died or became disabled while still nominally owned by Stillwater.

51.     The SLMA controlled all aspects of marketing loans to student borrowers, and required Stillwater to "print, package and distribute... Application Materials in forms acceptable to [the SLMA]," based on "a design template for such materials" provided by the SLMA. Stillwater was not allowed to alter the content or description of Application Materials without the SLMA's express written consent. Ex. A at 13. Stillwater's role was to add its "name, state, logo and OE number," to the applications, which made it appear as if Stillwater was the lender.

52.     Among other things, the SLMA: set the terms of the Private Loans; controlled the schools at which the loans could be made; determined which students would be approved for loans and for what amounts; and determined the interest rate on a borrower's loan based on proprietary credit criteria established by the SLMA. Ex. A at 3-4, 64-66, 70-73, 79-82.

53.     When the SLMA was dissolved in 2004 and merged into the SLM Corp., the SLMA-Stillwater Agreement was amended, and the SLMA's role was assigned to two wholly-owned subsidiaries of the SLM Corp., the SLM Education Credit and Finance Corporation and Sallie Mae, Inc.

1
2

### D. The SLMA Establishes a Securitization Program to Raise Funds to Make Loans

3
4
5

54.   The SLMA, and its parent and successor entity SLM Corp., obtained the funds to make loans through a securitization program, which raised funds by selling interest-bearing notes to investors.

6
7
8

55.   At a meeting on July 25, 2002, the SLM Corp.'s Board of Directors authorized the SLM Corp. or its subsidiaries to establish one or more subsidiary corporations or limited liability corporations by which to securitize private loans.

9
10
11
12
13

56.   Thereafter, the SLM Corp. and its subsidiaries established one or more "SLM Private Credit Student Loan Trust" each year ("SLM Private Credit Trust" or "SLM Private Credit Trusts"). The SLM Private Credit Trusts issued and sold notes to investors, with each Trust raising more than $1 billion. The funds were used to make private loans through the SLMA's forward purchase commitments.

14
15
16
17
18

57.   The funding and transfer of the loans was accomplished through a series of transactions involving special purpose entities, which resulted in the loans being assigned to various subsidiaries or affiliates of the SLM Corp. and its successor, Navient Corporation, including SLM Private Credit Trusts, VL Funding and NCFC.

19
20
21

58.   The SLM Private Credit Trusts, VL Funding and NCFC do not take physical possession of the promissory notes. The promissory notes remain in the possession and custody of NSI.

22
23
24
25
26
27
28

10

1
2

### E.      Private Loans Made Under the SLMA-Stillwater Agreement Are Subject to and Not Exempt From California's Usury Law

3
4
5

59.      The contracts used to make Private Loans under the SLMA-Stillwater Agreement consisted of a one page application and a corresponding promissory note.[4]

6
7
8

60.      All of the applications identified Stillwater National Bank, Stillwater, Oklahoma as the "Lender," and all the promissory notes stated that the loan was subject to the laws of the state where the lender was located.

9
10
11
12
13

61.      Notwithstanding the form of the transaction, the substance of the transaction was that the SLMA was the actual lender that made Plaintiffs' loans, not Stillwater. Plaintiffs' loans are thus subject to the California usury limit of 10% because under California law the substance, not the form of a transaction determines whether it is subject to the Usury Law.

14

### F.      The Loans Are Not Subject to National Bank Act Preemption

15
16
17
18

62.      The National Bank Act ("NBA"), 12 U.S.C. § 85 provides that loans made by a national bank are subject to the interest rates of the home state of the national bank, regardless of where the loans were made, and preempts other states' usury laws.

19
20
21

63.      This preemption provision does not apply to Plaintiffs' and Class members Private Loans because application of California state law would not significantly interfere with Stillwater's ability to exercise its power under the NBA.

22
23
24

64.      Even if the preemption of the NBA could be assigned, the Private Loans of Plaintiffs and the Class would not be subject to the preemption provision of the NBA because the loans were not made by Stillwater. Instead, under the terms

25
26

27
28

---

[4]   An exemplary application page and corresponding promissory note are attached as Ex. B.

11

of the SLMA-Stillwater Agreement, and as implemented, the loans were made by the SLMA, and later by SLM ECFC and other SLM Corp. subsidiaries.

> **G.** **The Department of the Treasury's Draft Report Determined the SLMA Originated Student Loans**

65.    In 2011, the Office of Sallie Mae Oversight ("OSMO") of the U.S. Department of the Treasury published on its website a draft report dated March 2006 and entitled, "Lessons Learned from the Privatization of Sallie Mae" ("OSMO Draft Report"). The OSMO Draft Report examined in detail the true role of the SLMA in making loans.

66.    The Draft Report explained that the SLMA had viewed its "wind down as an opportunity to reinvent its business ... to a vertically integrated company that originated loans for itself (and thereby controlled its acquisition costs)..." Ex. C at p. 5 (footnote omitted). However, because the SLMA was not a bank, it used so-called lender partner banks, such as Stillwater, to make it appear as if the loans were made by a national bank. Notwithstanding the form of these transactions, the Draft Report stated:

> Based on its examination of SLMA's relationship with its funding bank partners, OSMO concluded that SLMA, in substance, was originating certain private loans. The funding banks did not take long-term possession of the notes signed by the student borrowers, nor did they assume the credit risk associated with the notes. The GSE [SLMA] unconditionally purchased the notes, generally within a month, even in case of the borrower's death. Further, the economic substance of the payments by SLMA to the funding banks reflected loan origination via a "storefront" rather than second market activity.

Ex. C at 15 (footnote omitted).

67.     The OSMO Draft Report further explained, "[i]n a true secondary market, a bank would sell its asset into the secondary market (*i.e.*, to Sallie Mae) at its fair value.  However, in practice that was not how these loans 'sold' to Sallie Mae were priced." Ex. C at 15, n. 199. Instead, "[t]he loans were sold to Sallie Mae by its 'storefront banks' at cost plus interest during the holding period rather than at fair value.  This was, in effect, origination by SLMA." *Id.*

68.     As part of its new origination business, the SLMA and its affiliated entities expanded into so-called "trade school loans" and other private loans, raising billions of dollars through securitization to make loans to students attending for-profit schools. By 2004, when the SLMA was dissolved and merged into the SLM Corp., the SLM Corp. was managing $12 billion in private loans. Ex. C at 10-11.

## H.   NSI Charges and Receives Usurious Interest

69.     The Private Loans of Plaintiffs and the Class accrue interest from the date funds are disbursed until the loans are re-paid in full. Interest is charged at a "Variable Rate," which is determined by adding a fixed percentage set at the time the funds are disbursed (the "Margin"), to the prime rate.

70.     The Variable Rate is defined as:

the annual rate equal to the sum of the highest Prime Rate published in The Wall Street Journal Credit Markets' section, "Money Rates" table on the fifteenth day of the last month of the quarter prior to [the] loan's disbursement or Change Date (the "Current Index") plus or minus the percentage as identified on my Disclosure Statement, which is hereby incorporated into this Note, per annum (the "Margin") and rounded to the nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate for each quarter beginning January 1st will be determined by the applicable Prime Rate published on the preceding December 15th.)  The Margin is based on my school, credit history and co-borrower-s credit history.  Once

set, the Margin does not change.  The actual interest rate during the quarter in which my loan is disbursed will be on my Disclosure Statement.

Ex. B at 2, Sec. C.2.

71.     Thus, in any given quarter, NSI charges interest on the Private Loans of Plaintiffs and the Class at a rate equal to the (variable) Prime Rate plus the (fixed) Margin.

72.     Borrowers were not told the Margin (or the resulting interest rate) when they applied for a loan, or even when they were notified their application had been approved. Borrowers were first told the interest rate they were being charged when they were notified the loan funds had been or were being disbursed.

73.     Since Plaintiffs obtained their loans, the Prime Rate has ranged between 3.25% and 8.25%. See historical data for the Prime Rate, available at http://www.federalreserve.gov/releases/h15/data.htm.  The Prime Rate published in the Wall Street Journal also ranged between 3.25% and 8.25% during the Class Period.

74.     The fixed Margin for Plaintiffs' loans is 9.85%.

75.     NSI charged interest exceeding 10% on Plaintiffs' loans. In fact, the interest on their loans has been as high as 18.125%, and the interest on Plaintiff Beechum's loans has never been below 13.125%.

76.     NSI has charged, or charges, interest at a rate exceeding 10% to numerous student borrowers who have Private Loans.

77.     NSI received millions of dollars of interest on Private Loans of the Class that was charged at a rate exceeding 10%.

I.     **NSI Benefits From the Usurious Interest**

78.     NSI has an agreement with each of the SLM Private Credit Trusts and other entities to which the Private Loans are transferred, including VL Funding and NCFC to service the Private Loans. NSI pays itself a monthly fee for servicing the

14

loans based on the outstanding principal balance of the loans. The monthly fee is 1/12 (not to exceed 0.007%) of the sum of the outstanding principal of the loans.

79. NSI benefits from the usurious interest charged and paid by Plaintiffs and Class members because higher interest results in higher monthly payments which, in turn, results in borrowers being unable to pay down their loans as quickly.

80. NSI also benefits from the usurious rate of interest because unpaid interest is "capitalized," *i.e.*, added to the principal, and thereby increases the fees paid to NSI.

## J. NSI Exercises Control Over and Has a Beneficial Interest in the Plaintiffs' and Class Members' Private Loans

81. NSI also acts as administrator of the SLM Private Credit Trusts, including the 2005-A Trust, and other entities to which the Private Loans are transferred, including VL Funding and NCFC.

82. NSI is authorized under certain circumstances to transfer loans out of the SLM Private Credit Trusts and other entities and substitute other loans in their place.

83. NSI is able to and does exercise control over the rate of interest. For example, NSI offers a temporary rate reduction program to certain borrowers reducing the interest rate for a limited period of time.

84. NSI, or a related entity, is also the beneficiary of the insurance on Plaintiffs' and Class members' Private Loans.

85. Borrowers, including Plaintiffs and Class members, are not told or informed of the identity of the SLM Private Credit Trusts or other entities to which their Private Loans are transferred or nominally owned. In fact, borrowers have no means or ability to learn the identity of the SLM Private Credit Trusts or other entities to which their Private Loans are transferred or nominally owned. Plaintiffs in this case requested NSI to tell them the Trust or other entity to which their loans

1   had been transferred and NSI refused to do so. Plaintiffs were provided that
2   information only after filing suit.

3       **K.**    **The 2005-A Trust, VL Funding and NCFC Also Receive Usurious**
4           **Interest**

5       86.    After collecting and receiving payments from Plaintiffs and Class
6   members, NSI pays the interest and principal payments, made by the Plaintiffs and
7   Class members, to the counterparties and nominal owners of the Private Loans,
8   including Defendant 2005-A Trust, Defendant VL Funding and Defendant NCFC.
9

10  **V.**    **REPRESENTATIVE PLAINTIFFS AND THE CLASS**

11      **A.**    **Plaintiffs' Loans**

12      87.    **Plaintiff Jamie Beechum** applied for and obtained a Private Loan in
13  2004 to pay for the cost of her education at Brooks Institute of Photography.

14      88.    The margin is 9.85% and with the Prime Rate of 3.5%, the current
15  interest rate is 13.375% (rounded to the nearest one-eighth percent, see Ex. B, p.4).

16      89.    Plaintiff Beechum's loan was assigned to SLM ECFC shortly after
17  disbursement. Thereafter, SLM ECFC either directly or through intermediaries
18  transferred the loan to Defendant 2005-A Trust.

19      90.    Defendant NSI has serviced Plaintiff Beechum's Private Loan since its
20  inception.

21      91.    **Plaintiff Monica Hervey** applied for and obtained Private Loans in
22  2003 and in 2004 to pay for the cost of her education at Brooks Institute of
23  Photography.

24      92.    Plaintiff Hervey's outstanding loans are currently part of NSI's
25  temporary rate reduction program. Her enrollment in the program expires in
26  October 2016, at which time the interest rate will again be above 10% - unless the
27  rate reduction program continues and NSI accepts her into the program for another
28  year.

93.     Plaintiff Hervey's loans were assigned to the SLMA and SLM ECFC shortly after disbursement. Thereafter, the SLMA and SLM ECFC either directly or through intermediaries transferred the loans to Defendant NCFC.

94.     Defendant NSI has serviced Plaintiff Hervey's Private Loans since their inception.

**B.    The Private Loans Are the Same in All Material Respects.**

95.     Like all other borrowers who were provided Private Loans as to which Stillwater was identified as the lender, Plaintiffs received a standard form application page and promissory note.  Ex. B.  This promissory note could not be modified or otherwise negotiated by Plaintiffs or other borrowers since it was offered solely on a "take it or leave it" basis, and included statements such as "THIS IS A NON-NEGOTIABLE CONSUMER NOTE." See *e.g*: Ex. B at 4.

96.     Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, included an assignment clause providing, "If this Note is assigned, the Assignee will become the owner of this Note and will have all your rights to enforce this Note against me [the borrower]" and "I may not assign this Note or any of its benefits or obligations.  You may assign this Note at any time."  See Ex. B at 3, Sec. L, 10.

97.     Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, included a promise to pay providing that "I will make consecutive monthly payments during the Repayment Period in the amounts and on or before the payment due dates shown on my statements until I have paid all of the principal and interest and any other charges I may owe on this Note." See Ex. B at 2, Sec. D, 3.

98.     Plaintiffs' promissory notes, like all other promissory notes for Private Loans, provided that the interest would be determined at a variable rate. Ex. B at 2, Sec. C, 2.

99.   Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, provided that the interest rate would be determined on a quarterly basis. Ex. B at 2, Sec. C, 2.

100.   Plaintiffs' promissory notes, like the promissory notes for all other Private Loans, provided that accrued interest that was not paid would be capitalized, *i.e.*, added to the loan principal, and interest would then be charged on the increased principal. Ex. B at 2.

101.   Plaintiffs paid interest that had been charged at a rate of more than 10% on multiple occasions.

102.   On information and belief, at least one occasion each of the Plaintiffs did not pay accrued interest that had been charged at a rate exceeding 10% , and such interest was capitalized (*i.e.*, added to the outstanding principal of the loan). Thereafter, NSI charged Plaintiffs interest on the interest that had been capitalized.

103.   Plaintiffs and Class members did not consent to pay usurious interest, nor could they have consented to do so, because when they made payments they were unaware they were being charged interest at a usurious rate.

## VI.   CLASS ACTION ALLEGATIONS

104.   This action asserts claims pursuant to Federal Rules of Civil Procedure 23(a), and 23(b).

105.   Plaintiffs bring claims on behalf of themselves and a Class defined as:

All persons who obtained a Signature Loan, a CEC Signature Loan, or a CEC Recourse Loan with a loan application that identified Stillwater National Bank as the lender and listed California as the residence of the borrower, and who were charged interest at an annual rate of more than 10% for any quarterly period, and whose loan is outstanding or was paid off within four years of the filing of this action.

106.   The Class is subject to the following exclusions:

a.   Officers, directors, managerial employees of NSI and its parent and the parent's subsidiaries and their immediate families, and any of the judges of the court before which this case is pending and their immediate families;

b.   Officers, directors, managerial employees of Stillwater and its parent and the parent's subsidiaries and their immediate families;

c.   All Signature Loans, CEC Signature Loans and CEC Recourse Loans that were made with a promissory note that includes an arbitration clause or class action waiver.

## A.   The Class

107.   There are thousands of members in the Class who are geographically dispersed throughout California. Therefore, individual joinder of all members of the Class would be impracticable.

108.   Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members.  For the Class, these common legal or factual questions include, but are not limited to:

a.   Whether under California law, the substance of the transaction was that the actual lender who made the loans under the SLMA-Stillwater Agreement was the SLMA and its successors;

b.   Whether the loans are subject to the California usury limit of 10% ;

c.   Whether NSI charged interest on Private Loans at rates exceeding 10% ;

d.   Whether under the National Bank Act, the actual lender who made the loans under the SLMA-Stillwater Agreement was the SLMA and its successors;

e.   Whether the loans are subject to the interest preemption provision of the National Bank Act;

f.   Whether NSI's conduct violated California's Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq.*;

19

g.   Whether NSI is liable for violations of the California Usury Law;

h.   Whether NSI is liable for conversion;

i.   The appropriate measure of damages; and

j.   The appropriate scope of injunctive relief.

109.   Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs were charged and paid interest at a rate exceeding 10% on their Private Loans, and their loans were made in California. Plaintiffs, therefore, are not materially different in relevant respects from other Class members, and the relief sought is common to the Class.

110.   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members, and they have retained competent counsel experienced in conducting complex lending and class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Class.

111.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class member likely will be small by comparison to the burden and expense of the complex litigation necessitated by Defendants' wrongful conduct.  Thus, it would be virtually impossible for Class members to obtain redress on an individual basis. Additionally, class-wide litigation is preferable because individualized actions could lead to inconsistent or contradictory judgments.

112.   A class action also presents far fewer management difficulties, and provides the benefits of single adjudication, including economies of scale, and comprehensive supervision by a single court.  In the alternative, the Class may be certified because Defendants have acted or refused to act on grounds generally applicable to the members of the Class, thereby making appropriate preliminary and final equitable relief with respect to the Class.

113.    All records concerning each of the Private Loans entered into by members of the Class are in the possession or control of NSI and available through discovery.

## VII.   CLAIMS FOR RELIEF

### A.    <u>First Claim for Relief</u> — "Unlawful" Business Practices in Violation of The Unfair Competition Law, Bus. & Prof. Code §§ 17200, *Et Seq.*

114.    Plaintiffs incorporate paragraphs 1-113 as if fully stated here.

115.    This claim is brought on behalf of Plaintiffs and the Class against all Defendants.

116.    The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

117.    A business act or practice is "unlawful" if it violates any established state or federal law.

118.    Article XV of the California Constitution sets a maximum legal rate of 10% for interest charged on loans for educational expenses such as the Private Loans. In pertinent part, it states:

Section 1.  The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:

    (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum....

119.   The Private Loans are loans of money primarily for personal, family, or household purposes subject to Cal. Const., art. XV, § 1(1).

120.   The Private Loans are loans of money expressed "in writing" within the meaning of the Usury Law.  Cal. Civ. Code § 1916-1.

121.   The 10% interest rate limit set forth in Cal. Const., art. XV, § 1(1) and the Usury Law apply to the Private Loans, and such loans are not subject to any of the exemptions from the Usury Law.

122.   The loans were not made by a national bank within the meaning of the National Bank Act, 12 U.S.C. §§ 85 and 86.

123.   NSI has charged interest on the Private Loans at a rate exceeding 10 % and thus exceeding the legal limit.

124.   The interest charged at a usurious rate that was not paid was capitalized (*i.e.*, added to the outstanding principal).

125.   Defendant NSI has violated and continues to violate, the "unlawful" prong of the UCL by charging borrowers interest in violation of California's Constitution, art. XV, § 1(1), and the Usury Law. By committing the acts and practices alleged above, Defendant has engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

126.   Through its unlawful acts and practices Defendant NSI has obtained, and continues to unfairly obtain, money from Plaintiffs and the Class. As such, Plaintiffs requests on behalf of themselves and the Class the relief set forth in the Prayer, including that this Court enjoin Defendant from continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Class may be irreparably harmed and/or denied an effective and complete remedy.

**B.** **Second Claim for Relief — "Unfair" Business Practice in Violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200, _Et Seq._**

127.   Plaintiffs incorporate paragraphs 1-113 as if fully stated here.

128.   This claim is brought on behalf of Plaintiffs and the Class against all Defendants.

129.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

130.   Defendant NSI has and continues to violate the "unfair" prong of the UCL through its assessment of interest at a rate exceeding 10% on the Private Loans.

131.   Defendant NSI's assessment of interest at rates exceeding 10% violates the "unfair" prong of the UCL because it is not entitled to charge such interest, and such interest is excessive and not justified by any business need, and creates an onerous burden on Plaintiffs and the Class.

132.   The gravity of the harm to Plaintiffs and the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives for Defendant's conduct. By committing the acts and practices described above, Defendant has engaged, and continues to be engaged, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, _et seq._

133.   Through unfair acts and practices Defendant NSI has obtained, and continues to obtain, money from Plaintiffs and the Class. As such, Plaintiffs request on behalf of themselves and the Class the relief set forth in the Prayer, including that the Court enjoin Defendant NSI from continuing to violate the UCL. Otherwise, the Class may be irreparably harmed and/or denied an effective and complete remedy.

1     **C.**     **Third Claim for Relief** — Usury in Violation of Article XV, Section 1,

2              of the California Constitution

3        134.    Plaintiffs incorporate paragraphs 1-113 as if fully stated here.

4        135.    This claim is brought on behalf of Plaintiffs and the Class against all

5   Defendants.

6        136.    Under the California Constitution, the maximum rate of interest for

7   any loan, if the money, goods, or things in action are for use primarily for personal,

8   family, or household purposes, is 10 %.  Cal. Const., art. XV, § 1(1).

9        137.    The Private Loans are "loans" for "money" for use "primarily for

10  personal, family, or household purposes," within the meaning of the California

11  Constitution, art. XV, § 1(1).

12       138.    The Private Loans are subject to the California Usury Law and are not

13  excluded or otherwise exempt from the constitutional proscription on usury.

14       139.    Defendant NSI charged Plaintiffs and all members of the Class interest

15  exceeding the lawful statutory maximum rate of 10%.

16       140.    The Private Loans and interest thereon are absolutely repayable.

17       141.    Through usurious charges, Defendant NSI has received, and continues

18  to receive, money from Plaintiffs and the Class in violation of the California

19  Constitution. As such, Plaintiffs request on behalf of themselves and the Class the

20  relief set forth in the Prayer, including that this Court enter an order refunding all

21  interest paid that was charged at a usurious rate, or directing it to be applied to

22  principal, cancelling interest that was charged at a rate exceeding 10% that remains

23  outstanding, or that was capitalized, as well as interest that was charged on the

24  capitalized usurious interest, and limiting any future interest to not more than 10%.

25  Plaintiffs also request that this Court award any other relief that is just and proper.

26

27

28

1

**D.** <u>Fourth Claim for Relief</u> — Violation of the Usury Law

2
142.   Plaintiffs incorporate paragraphs 1-113 as if fully stated here.

3
143.   This claim is brought on behalf of Plaintiffs and the Class against all

4
Defendants.

5
144.   California's statutory proscription against usury is set forth in the

6
Usury Law, an un-codified Initiative Measure adopted nearly 100 years ago. See

7
Cal. Civ. Code § 1916-1 through § 1916-3.

8
145.    The Usury Law provides in part:

9
"The rate of interest upon the loan or forbearance of any money,

10
goods or things in action or on accounts after demand or judgments

11
rendered in any court of this state, shall be seven dollars upon the one

12
hundred dollars for one year and at that rate for a greater or less sum or for

13
a longer or a shorter time; but it shall be competent for parties to contract

14
for the payment and receipt of a rate of interest not exceeding twelve dollars

15
on the one hundred dollars for one year and not exceeding that rate for a

16
greater or less sum or for a longer or shorter time, in which case such rate

17
exceeding seven dollars on one hundred dollars shall be clearly expressed in

18
writing." Cal. Civ. Code § 1916-1.

19
146.   As recognized in *Penziner v. West American Finance Co.*, 10 Cal. 2d

20
160, 174, 74 P.2d 252 (Cal. 1937), the 12% interest rate established by the Usury Law

21
for contracts in writing was amended to 10% by adoption of the usury provisions of

22
the California Constitution.

23
147.   Private Loans are "loans" for "money" expressed "in writing" within

24
the meaning of the Usury Law.  The loans are not excluded or otherwise exempt

25
from the Usury Law.

26
148.   Defendant NSI charged Plaintiffs and Class members interest

27
exceeding 10%.

28

149.   The counterparty to the contract willfully intended to enter these transactions and to charge and receive interest charged at a rate exceeding 10%.

150.   Through usurious charges, Defendant has received, and continues to receive, money from Plaintiffs and the Class in violation of the Usury Law, as amended. As such, Plaintiffs request on behalf of themselves and the Class the relief set forth in the Prayer, including an award of three times the interest paid on the Private Loans as provided by the Usury Law, and an order canceling all future interest on the Private Loans exceeding 10%. Cal. Civ. Code § 1916-3(a).

**E.**   <u>Fifth Claim for Relief</u> − Claim For Money Had and Received

151.   Plaintiffs incorporate paragraphs 1-113 as if fully stated here.

152.   This claim is brought on behalf of Plaintiffs and the Class against all Defendants.

153.   Defendant NSI is indebted to Plaintiffs and the Class members.

154.   Defendant NSI received money belonging to Plaintiffs and the Class that should have been used for their benefit by reducing the outstanding principal on their loans.

155.   The money was not used for the benefit of Plaintiffs or the Class.

156.   The money was instead used by Defendant to pay interest that was charged at a usurious rate.

157.   Defendant has not returned any money to Plaintiffs or the Class, nor has Defendant applied the money to principal for the benefit of the Plaintiffs or the Class.

158.   As a matter of equity and good conscience, the money should be returned to Plaintiffs and the Class or be used for their benefit by applying it to the payment of the principal of their respective loans.

1        **F.**   <u>**Sixth Claim For Relief**</u> - **Conversion**

2        159.   Plaintiffs incorporates paragraphs 1-113 as if fully stated here.

3        160.   This claim is brought on behalf of Plaintiffs and the Class against

4 Defendant NSI.

5        161.   Defendant NSI wrongfully took, and misappropriated, payments of

6 interest that had been charged at a rate exceeding 10% from Plaintiffs and the Class.

7        162.   Plaintiffs and Class members were the proper owners of the interest

8 payments wrongfully taken by Defendant at the time of the taking.

9        163.   Plaintiffs and Class members were damaged as a result of the wrongful

10 taking of the interest charged at a rate exceeding 10%. The specific sums in which

11 Plaintiffs and Class members were damaged are capable of identification using

12 Defendant NSI's own records, kept in the ordinary course of doing business.

13

14 **VIII.  PRAYER**

15        WHEREFORE, Plaintiffs, on behalf of themselves and the Class, request an

16 award and relief as follows:

17        **A.**   An order certifying that this action is properly brought and may be

18 maintained as a class action, that Plaintiffs be appointed Class Representatives for

19 the Class, and that Plaintiffs' counsel be appointed Class Counsel.

20        **B.**   Restitution in an amount to be determined.

21        **C.**   An order refunding all interest paid that was charged at a rate

22 exceeding 10%, or directing that it be applied to principal.

23        **D.**   An order cancelling all interest that was charged at a rate exceeding

24 10% that was not paid, including interest that was charged at a rate exceeding 10%

25 that was capitalized, and interest charged on that capitalized interest.

26        **E.**   An order awarding three times the interest paid by Plaintiffs and Class

27 members within one year of filing suit, and thereafter, which was charged at a

28

1  usurious rate or, alternatively, three times the amount of interest paid on Private

2  Loans exceeding the 10%  legal limit.

3    **F.** Damages as permitted under California law.

4    **G.** An order enjoining interest being charged at a rate exceeding 10% on

5  Plaintiffs' and Class members' Private Loans.

6    **H.** An order awarding Plaintiffs' their costs of suit, including reasonable

7  attorneys' fees and pre- and post-judgment interest.

8    **I.** Such other and further relief as may be deemed necessary or

9  appropriate.

10

11  **IX.** **DEMAND FOR JURY TRIAL**

12    Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

13

14   DATED: March 1, 2016    By: *_/s/ William J. Genego_*

15

16

17

18

19

20

21

22

23

24

25

26

27

28